```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                        EASTERN DIVISION

JAMEECIA[1] TOBAR,                  )
                                    )
            Plaintiff,              )
                                    )
     v.                             )   No. 4:11 CV 1939 DDN
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
            Defendant.              )
```

### MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Jameecia Tobar for child's disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u> and for supplemental security income under Title XVI, 42 U.S.C. § 1381, <u>et seq.</u>  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

### I. BACKGROUND

Plaintiff was born in 1991.  On April 5, 2010, plaintiff's legal guardian filed applications on her behalf, alleging disability since September 1, 1998, due to learning disabilities and speech problems. (Tr. 106-116, 176.)  Her claims were denied initially and after a hearing before an ALJ.  (Tr. 11-19, 42-52.)  On October 5, 2011, the Appeals Council denied plaintiff's request for review.  (Tr. 1-3.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### II. EDUCATIONAL AND OTHER HISTORY

---

[1] The administrative record shows plaintiff's correct first name is "Jameecia."  Therefore, the pleadings are amended as necessary to show the correct spelling of her first name.

On May 7, 2004, when plaintiff was 13 years old, staff at her school district administered the Wechsler Individual Achievement Test (WIAT-II). Plaintiff had a reading composite score of 55, mathematics composite score of 66, and writing composite score of 64.  (Tr. 204.)

On May 12, 2004, school district staff administered the Stanford-Binet Intelligence Scale.  Plaintiff scored a full scale IQ score of 53, verbal IQ score of 58, and nonverbal IQ score of 52.  School district staff also administered the Wechsler Intelligence Scale for Children (WISC-III).  Plaintiff scored a full scale IQ score of 49, a verbal IQ score of 56, and a performance IQ score of 49.  School district staff noted that plaintiff cooperated with the testing process and exhibited good effort, perseverance, and task focus, and opined that the results of the assessments were believed to be valid estimates of her current functioning level.  The staff opined that the results of the testing were consistent with the criteria for identifying plaintiff with mental retardation.  (Tr. 201-05.)

On April 3, 2009, Alison Burner, M.A., conducted a consultative psychological evaluation.  Ms. Burner noted that plaintiff had an unremarkable medical history.  She administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III).  Plaintiff scored a full scale IQ score of 76, verbal IQ score of 75, and performance IQ score of 81.  Ms. Burner opined with a 95% confidence level that plaintiff's IQ fell within the borderline range of intellectual functioning.  She noted weaknesses in numerical reasoning and short-term memory and a strength in graphomotor speed.  All other skills fell within the borderline range. (Tr. 251-53.)

Ms. Burner considered the evaluation a valid estimate of plaintiff's actual abilities and stated that plaintiff appeared to demonstrate adequate motivation.  She suggested that plaintiff's difficulties in school were the result of slow learning, rather than a learning disability.  She opined that plaintiff had no significant cognitive deficiency that would preclude obtaining and maintaining gainful employment and stated that plaintiff could obtain employment in line with her intellectual functioning.  She opined that plaintiff might be best-suited for non-complex manual labor or repetitive jobs and not

well-suited for work involving money management, such as the operation of cash registers. (Tr. 252-53.)

On March 14, 2011, plaintiff's counsel submitted interrogatories to Ms. Burner, and Burner responded the following day. Ms. Burner noted that she did not review any records prior to examining plaintiff, as none were submitted for her review. Ms. Burner stated that plaintiff's scores on the WISC-III in 2004 and the WAIS-III in 2009 were statistically significantly different, noting that plaintiff's test scores in the former test placed plaintiff in the moderately mentally retarded range, while the scores in the latter placed her in the borderline range of intellectual functioning. Similarly, Ms. Burner stated that plaintiff's 2004 Stanford-Binet score and 2009 WAIS-III score were statistically significantly different. She noted that the Stanford-Binet score was slightly higher than the WISC-III score and fell in the moderate to mild range of mental retardation. (Tr. 273-80.)

Ms. Burner opined that there were several possible explanations for the discrepancies in scores between the 2004 and 2009 testing. She opined that it was possible that one or all of the tests were not valid or reliable, either because of poor cooperation or human error. She could not speak to the reliability of the tests. She also observed "significant discrepancy" in the school records. Ms. Burner noted that plaintiff was "initially educationally diagnosed" with a learning disability and language impairment in 2000, an educational diagnosis that could not have been reached had her IQ scores fallen in the mentally retarded range under government guidelines. (Tr. 277-80.)

Ms. Burner further stated that plaintiff was initially granted Social Security benefits for learning disability and speech problems in 2004. She noted that mental retardation was apparently not alleged at that time and was apparently not the reason for the allowance. She opined that if 2000 and 2003 IQ scores were available, they might have indicated a pattern of a higher level of cognitive ability, with the exception of the 2004 IQ scores. Ms. Burner opined that the testing was old enough that its protocol had been destroyed and could not be reviewed to check scoring accuracy. She opined that the scores might not actually be discrepant, noting that IQ scores can occur within a statistically

-3-

reliable range.  Ms. Burner also opined that the discrepancy could result from different adult and child versions of the tests.  Ms. Burner stated that she did not read any portion of the IQ test to plaintiff.  She stated that she had administered examinations, including IQ tests to children, for over 20 years. (Tr. 277-80.)

In an Individualized Education Program (IEP) dated February 19, 2010, plaintiff was described as having "an educational diagnosis of Intellectual Disabled" that affected her rate of learning, reading grade level, reading comprehension, written expression, math concepts and computation, and completion of classroom and homework assignments. Plaintiff learned best when information was broken into small steps and mastered before moving to the next step.  (Tr. 137-38.)

Plaintiff participated in a work program at her high school in which she had janitorial, food preparation, clerical, and kitchen duties. Plaintiff was able to work at all of those work sites with few prompts required to keep her on task.  Once she learned a skill, she could perform it with little supervision.  Plaintiff learned new skills when provided with extensive repetition in a supported work environment.  She required repetition of skills not provided by competitive work training regiments.  It was noted plaintiff would need support in a normal work environment to avoid being taken advantage of or exploited.  She had not demonstrated the potential hazards of some social situations. (Tr. 139.)

At that time, the IEP concluded her diagnosis of mental retardation appeared appropriate, and no further testing was required.  The IEP listed plaintiff's employment goal as employment in a nursing home, veterans' home, or food service with support from the Division of Vocational Rehabilitation.  (Tr. 139.)

An IEP dated May 19, 2010, described plaintiff similarly.  The IEP indicated functional difficulties in completing forms or applications independently, budgeting money, and counting coins.  Plaintiff was unable to independently access public transportation in the community or work sites.  Plaintiff was self-motivated, but required support, encouragement, and repetition at each work site.  The IEP team concluded her diagnosis of mild mental retardation (intellectually disabled) remained appropriate, no further testing was required, and academic

-4-

skills in reading, written expression, and math were below grade level consistent with her diagnosis of intellectually disabled. She would be an excellent candidate for supportive employment. The IEP stated plaintiff's employment goal was obtaining competitive employment with supports in the area of food service. (Tr. 193-96, 208-09, 216.)

A Psychiatric Review Technique form was completed by Stephen S. Scher, Ph.D., on June 15, 2010, when plaintiff was 19 years old. It reflected mild limitations in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Plaintiff received Special School District services while attending high school for learning disabilities and speech impairment. No other psychiatric issues were noted or alleged. Plaintiff's alleged functional limitations were found to be less than credible. Plaintiff was capable of following at least two-step instructions, which would be easier for plaintiff if they were verbal. Plaintiff was capable of performing simple work tasks and had no limitation of social interactions. (Tr. 254-64.)

Dr. Scher also completed a Mental RFC questionnaire the same day. He indicated plaintiff had moderate limitations in the ability to understand or remember detailed instructions, to carry out detailed instructions, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others. Dr. Scher opined that plaintiff retained the mental ability to understand and remember simple instructions and to sustain attention to complete simple repetitive tasks. Contact with the public was not precluded. Plaintiff could adapt to routine changes and avoid workplace hazards. (Tr. 266-68.)

**Testimony at the Hearing**

Plaintiff testified to the following at an administrative hearing held on March 24, 2011. She attended special education classes and graduated from high school in 2010. She does not have a driver's license. She has academic difficulties in math, reading, and spelling. She can take a telephone message with assistance. She participated in

work study program at a grocery store for two years bagging groceries. She does not have any physical problems. She can prepare simple meals such as sandwiches and canned soup with assistance. She does not have any hobbies. She can handle her own personal care. (Tr. 20-33.)

Jenifer Teixeira, a vocational expert (VE), testified in response to a hypothetical question from the ALJ which outlined plaintiff's age, education, and work experience. The ALJ's hypothetical individual could lift and carry 20 pounds occasionally and 10 pounds frequently. The individual could sit, stand, and walk with usual breaks for about six hours in an eight-hour workday. She was limited to jobs that involved understanding, remembering, and following simple instructions and directions in a work setting with no more than routine changes. The individual performed better with verbal than written instructions and, if instructions were written, they had to be at an elementary school level. She would need repetition of instruction and supervision while learning tasks, but once she learned a task, she could perform without special supervision. The hypothetical individual could not perform work that required dealing with money, such as making change. She could have no more than rare contact with the public while on the job. The VE testified that this individual could return to perform other jobs existing in significant numbers in the national economy, such as racker, street cleaner, and bottling line attendant. (Tr. 36-38.)

### III.  DECISION OF THE ALJ

On April 1, 2011, the ALJ issued a decision unfavorable to plaintiff. The ALJ found that plaintiff had the severe impairments of learning disabilities, borderline intellectual functioning, and obesity. The ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing.

The ALJ found that plaintiff retained the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently. Plaintiff could sit, stand, and walk with usual breaks for about six hours in an eight-hour workday. She was limited to jobs that involved understanding, remembering, and following simple instructions and directions in a work

setting with no more than routine changes.  Plaintiff performed better with verbal rather than written instructions, and if instructions were written, they had to be at an elementary school level.  Plaintiff would need repetition of instruction and supervision while learning tasks, but once she learned a task, she could perform without special supervision. She could not perform work that required dealing with money, such as making change.  She could have no more than rare contact with the public while on the job.

The ALJ further found that plaintiff could perform other jobs existing in significant numbers in the national economy, such as racker, street cleaner, and bottling line attendant. Consequently, the ALJ found that plaintiff was not disabled within the meaning of the Act.  (Tr. 13-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual

-7-

qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her PRW.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred (1) in considering Listing § 12.05 addressing mental retardation;  (2) in assessing her RFC; and (3) in posing the hypothetical question to the VE.

**1.   Listing § 12.05 - Mental Retardation**

Plaintiff argues that she meets or equals the criteria of Listing § 12.05, which deals with mental retardation.  She asserts the ALJ erred in giving greater credence to Ms. Bruner, the consultative evaluator, over that of a school psychologist.  She argues that under Social Security Ruling 06-3p, the school psychologist is considered an acceptable source of medical proof.  The court disagrees.

"To qualify for disability under a listing, a claimant carries the burden of establishing that his condition meets or equals all specified medical criteria." McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011) (citing Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995)).  A claimant will not be deemed to meet a listing merely because she has a diagnosis of a condition named therein and meets just some of the criteria.  Id. at 612.  While an ALJ is required to consider evidence of

-8-

listed impairments and determine whether they meet or equal any of the listed impairments, "[t]he fact that the ALJ d[oes] not elaborate on this conclusion does not require reversal [where] the record supports h[is] overall conclusion."  Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006).

The regulations define mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" before age 22.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  The required level of severity for § 12.05 is met when an impairment satisfies the diagnostic description in the introductory paragraph, as well as any one of the four sets of criteria set forth in paragraphs A, B, C, or D.  See 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.00 and 12.05; Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

The required level of severity is met for this Listing only when the requirements of one of the subsections are also met:

> A.   Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> B.   A valid verbal, performance, or full scale IQ of 59 or less;
>
> C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D.   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1.   Marked restriction of activities of daily living; or
>
> 2.   Marked difficulties in maintaining social functioning; or
>
> 3.   Marked difficulties in maintaining concentration, persistence, or pace; or

>       4.   Repeated episodes of decompensation, each
>   of extended duration.

Id.

It is plaintiff's burden to demonstrate, through medical evidence, that her impairments meet or equal all of the specified medical criteria contained in a particular listing. See Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). An impairment that manifests only some of those criteria, no matter how severely, does not qualify. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990). The Listing does not require the Commissioner to make a finding of mental retardation based on IQ test results alone. See Gasaway v. Apfel, 195 F.3d 345, 345 (8th Cir. 1999). As the above Listing and the Diagnostic and Statistical Manual of Mental Disorders both provide, the diagnosis of mental retardation requires both subaverage general intellectual functioning and deficits in adaptive functioning. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (DSM-IV-TR) 41 (4th ed. 2000). Both sources make clear that a low IQ score is not sufficient for diagnosis, nor is a low IQ score alone sufficient to meet the Listing. The ALJ's determination that plaintiff did not meet or equal any of the four subsections of Listing § 12.05 is supported by substantial evidence on the record as a whole. Subsection 12.05A requires a mental incapacity evidenced by, inter alia, dependence on others for personal needs, such as "toileting, eating, dressing, or bathing." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05A. Although plaintiff does not argue that she meets the requirements of Listing § 12.05A, the record evidence also demonstrates that plaintiff was not dependent on others for those needs. (Tr. 33.)

The ALJ correctly noted that plaintiff did not meet the requirements of Listing § 12.05B because she had no valid IQ score of 59 or less. (Tr. 15.) The ALJ discussed all of plaintiff's IQ scores, noting the May 2004 Stanford-Binet full scale IQ score of 53, verbal IQ score of 58, and nonverbal IQ score of 52, as well as the WISC-III full scale IQ score of 49, verbal IQ score of 56, and performance IQ score of 49. (Tr. 13-14, 201.) The ALJ observed that Ms. Burner administered the WAIS-III to plaintiff in April 2009, resulting in a full scale IQ score of 76, a

-10-

verbal IQ score of 75, and a performance IQ score of 81.  (Tr. 14, 252.) The ALJ acknowledged the 2004 scores but gave greater weight to the more recent IQ scores obtained by Ms. Burner, noting that she had offered possible reasons for the discrepancies between the IQ scores. (Tr. 15.) See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998) (Commissioner is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record).  Test results of this sort should be examined "to assure consistency with daily activities and behavior." Id. Here, the ALJ identified the evidence that was inconsistent with plaintiff's most recent IQ scores and properly relied upon the later scores.

While the ALJ acknowledged that it was unclear who performed the 2004 testing, plaintiff correctly notes that those tests were conducted by a school psychologist, an acceptable medical source. (Tr. 14, 201.) 20 C.F.R. §§ 404.1513(a)(2) and 416.913(a)(2); Social Security Ruling (SSR) 06-3p, 2006 WL 2263437 (Aug. 9, 2006).  The ALJ properly found that there was no record evidence to show the validity of the earlier scores. (Tr. 14.)  Moreover, plaintiff's 2004 IQ scores are not valid because they were obtained 8 years ago, when plaintiff was only 13 years old. (Tr. 201.)

Listing § 112.00 discusses IQ scores for children:

> IQ test results must also be sufficiently current for accurate assessment under 112.05.  Generally, the results of IQ tests tend to stabilize by the age of 16.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10).  Here, under the Listing, plaintiff's score was obtained when she was 13 years old, and it was only valid for 2 years, or until May 2006.  See id.  Therefore, the results of Ms. Burner's consultative examination were the only valid IQ scores in the record, and there was no "valid verbal, performance, or

-11-

full scale IQ of 59 or less" in the record that could meet Listing § 12.05B. See, e.g., Rucker for Rucker v. Apfel, 141 F.3d 1256, 1260 (8th Cir. 1998) (IQ scores obtained between ages 7 and 16 are valid for only two years when the score is 40 or above). Thus, the ALJ would have erred had he relied upon plaintiff's 2004 scores to support a finding that plaintiff satisfied Listing § 12.05B. Because the 2004 IQ scores were invalid as a matter of law, the ALJ properly gave greater weight to plaintiff's 2009 IQ scores.

Third, substantial evidence supports the ALJ's finding that plaintiff did not meet the requirements of Listing § 12.05C. (Tr. 15.) The ALJ properly observed that there was no "valid verbal, performance, or full scale IQ of 60 through 70" in the record that could meet Listing § 12.05C. See Rucker, 141 F.3d at 1259-60. Instead, the only valid scores available to the ALJ were from the 2009 testing, none of which were below 70. (Tr. 252.)

Finally, plaintiff did not meet the requirements of Listing § 12.05D. Plaintiff does not have a valid IQ score to satisfy this subsection. The ALJ also found that plaintiff had mild restrictions of mental activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 16.) These findings preclude a determination that plaintiff met Listing § 12.05D.

The court concludes substantial evidence on the record as a whole supports the ALJ's finding that plaintiff does not meet or equal the criteria of Listing § 12.05.

**2. Residual Functional Capacity**

Plaintiff next argues the ALJ erred in assessing her RFC. RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records,

physicians' opinions, and a claimant's description of her limitations. <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a).  While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional.  <u>Lauer</u>, 245 F.3d at 704.

The ALJ found plaintiff would be capable of light work.  She could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She could sit, stand, and/or walk 6 hours in an 8-hour workday.  She could understand, remember, and carry out simple instructions in a work setting with no more than routine changes.  Plaintiff would do better with verbal instructions, and if written instructions were used they would need to be at an elementary level.  She might need repetition of instruction and supervision while learning tasks.  Plaintiff would be unable to perform work that required dealing with money, such as making change, and should have no more than rare contact with the public.  (Tr. 16.)

Plaintiff argues the ALJ erred because there is significant evidence indicating she needed a supported work environment, as well as extended repetition in order to learn skills.  Plaintiff also contends the ALJ wrongly relied upon Ms. Burner's finding of borderline intellectual functioning, which was not a fully informed finding and did not properly consider the school records.  She argues further that Ms. Burner could not explain the discrepancy with any degree of medical certainty.

The court disagrees.  It is permissible for the ALJ to consider a claimant's activities of daily living.  <u>Cf.</u> <u>Clevenger v. Astrue</u>, 567 F.3d 971, 976 (8th Cir. 2009)("Our cases admittedly send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain, but [claimant] did report that she engaged in an array of such activities – including doing laundry, washing dishes, changing sheets, ironing, preparing meals, driving, attending church, and visiting friends and relatives – and it was not unreasonable under for the ALJ to rely on this evidence to infer that [claimant's] assertion of disabling pain was not entirely credible.").  Plaintiff's argument about her activities of daily living is merely a disagreement with the ALJ's evaluation of the evidence and implies that the court should weigh the evidence differently.  The court will decline to do so.  See <u>Qualls v.</u>

Apfel, 158 F.3d 425, 427 (8th Cir. 1998) ("This court cannot reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision.") To the extent plaintiff is arguing that the ALJ erred in relying on Ms. Burner's opinion and should have adopted the opinions of the treating physician, the court disagrees. In this case there was no valid opinion available from any treating physician, nor does plaintiff identify any. The school psychologist identified in the 2004 testing did not "treat" plaintiff, and plaintiff does not contend otherwise.

Here, as discussed above, the ALJ reviewed the medical evidence and formulated an RFC in keeping with the record as a whole. (Tr. 16.) The ALJ included limitations intended to account for plaintiff's mental impairments. The ALJ relied on Ms. Burner's opinion that plaintiff had no significant cognitive deficiency that would preclude obtaining and maintaining gainful employment and that plaintiff could obtain employment in line with her intellectual functioning. (Tr. 253.) Those limitations are also in line with plaintiff's February and May 2010 IEPs, which stated that plaintiff learned best when information was broken into small steps and mastered before moving to the next step, and that once she learned a skill, she could perform it with little supervision. (Tr. 138-39, 208.)

Substantial evidence supports the ALJ's finding that plaintiff did not require repetition or special supervision beyond initial training and could therefore perform competitive work. (Tr. 16.)

### 3. Hypothetical Question

Plaintiff argues the hypothetical question to the VE was flawed because it did not capture the concrete consequences of her impairment, and as a result, the VE's response does not constitute substantial evidence. Plaintiff contends that she is incapable of competitive employment when her school records are considered, along with the functional limitations that flow from those medically determinable impairments.

The ALJ's hypothetical question to the VE must completely describe a claimant's individual impairments. See House v. Shalala, 34 F.3d 691,

694 (8th Cir. 1994). The question must include only those impairments which actually exist, and are supported by substantial evidence, not those rejected by the ALJ. See Davis v. Shalala, 31 F.3d 753, 755 (8th Cir. 1994); see also Bradshaw v. Heckler, 810 F.2d 786, 790 (8th Cir. 1987) (hypothetical must state with precision claimant's physical and mental impairments). An improper hypothetical question cannot serve as substantial evidence under § 405(g). See Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986).

In this case the ALJ found plaintiff did not have any past relevant work. In response to a hypothetical that included the ALJ's RFC findings that included all of plaintiff's credible impairments, the VE testified that such an individual could perform other jobs existing in significant numbers in the national economy, such as racker, street cleaner, and bottling line attendant. (Tr. 38.)

The hypothetical question was proper, as it included only those impairments and restrictions found credible by the ALJ. See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) ("Discredited complaints . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."). The ALJ concluded, based upon VE testimony, that plaintiff could make a successful adjustment to other work, citing occupations such as a racker, a street cleaner, and a bottling line attendant. (Tr. 17-18.)

Because the hypothetical question was properly formulated, the VE's testimony that jobs existed that plaintiff could perform constitutes substantial evidence supporting the Commissioner's decision. See Miller v. Shalala, 8 F.3d 611, 613-14 (8th Cir. 1993).

### III. CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is supported by substantial evidence in the record as a whole and is consistent with the applicable law. The decision of the Commissioner of Social Security is affirmed.

An appropriate Judgment Order is issued herewith.

/S/    David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on October 17, 2012.